# STANBON v. HOWE (1).

PATENTS; INTERFERENCE; REDUCTION TO PRACTICE.

In an interference proceeding involving the invention of a channel cement-
ing machine used in shoe manufacturing, where it appeared that one
of the parties conceived the invention and constructed a machine em-
bodying every feature of it and tested it several months prior to the
earliest date claimed by the other party, and offered in evidence as
an exhibit an exact reproduction of the machine, which was not shown
by the other party to be inoperative or used for the purpose of con-
tradicting the testimony of his rival's witnesses, it was *held* on a
review of the evidence that the tests were sufficient to demonstrate
to those skilled in the art the success of the device, and that the
first machine constituted a reduction to practice. (Following *Wurts*
v. *Harrington,* 10 App. D. C. 149; *Roe* v. *Hanson,* 19 App. D. C.
559; *Smith* v. *Brooks,* 24 App. D. C. 75; *Burson* v. *Vogel,* 29 App.
D. C. 388.)

No. 607.   Patent Appeals.   Submitted January 13, 1910.   Decided Feb-
ruary 1, 1910.

HEARING on an appeal from a decision of the Commissioner
of Patents in an interference case.                    *Reversed.*

The facts are stated in the opinion.

*Mr. Frederick L. Emery* and *Mr. Laurence A. Janney* for
the appellant.

*Mr. A. D. Salinger* and *Mr. Horace A. Dodge* for the ap-
pellee Furber.

Mr. Justice ROBB delivered the opinion of the Court:

This is an appeal by Charles P. Stanbon from a decision of
the Commissioner of Patents in an interference proceeding af-

firming a decision of the Examiners-in-Chief and awarding priority of invention to the junior party, Frederick M. Furber, the appellee here, Charles E. Howe, and Frank H. Warren being nominal appellees only, they having abandoned the proceeding after the decision of the Examiner of Interferences.

The invention is a machine for cementing the walls of an oblique incision or "channel" cut in the sole of a shoe preparatory to sewing the outer sole, and extending around the sole and parallel to its edge. The incision is, of course, inclined inwardly to form a thin lip which is turned back toward the sole face so as to leave the incision open and ready to receive the thread. After the sewing process is complete it is necessary to cement the faces or walls of this so-called channel and turn the lip back to its original position, in that way closing the incision, concealing the stitches, and leaving the sole surface smooth. Before the device of the issue it had been the practice to apply the cement to said channels manually. The Patent Office tribunals selected the three following counts as sufficiently illustrative of the twenty-four counts of the issue:

"1. A channel cementing machine, having in combination a cement applying brush, and a channel flap guide arranged to support the flap in contact with the brush, substantially as described."

"7. In a machine of the class described, the combination with means for applying cement to a shoe sole, of guiding means comprising a support and a movable work-engaging member mounted thereon and provided with a laterally projecting portion adapted to extend under the channel-flap of the sole for guiding the work to the cement-applying means."

"24. In a machine of the class described, the combination with means for applying cement to the channel flap of a shoe sole, of means arranged to extend under the channel flap and between the cement applying means and the face of the sole adjacent to said applying means for protecting the face of the sole from the cement."

The Examiner of Interferences found that Charles P. Stanhon constructed and tested a machine embodying all the counts

of the issue as early as April 4th, 1903, which was about three months prior to the earliest date claimed by Furber. He further found that Furber had failed to establish reduction to practice prior to Stanbon's filing date, and hence, without determining whether Stanbon's early construction constituted reduction to practice, awarded priority of invention as to all the counts to Stanbon.

The Examiners-in-Chief, in discussing Stanbon's date of conception, said: "We deem it unnecessary to discuss the question of Stanbon's conception, since it is clearly shown by the testimony that he produced a machine embodying the invention of the issue in March or April, 1903." They held, however, that this machine "amounted to no more than an abandoned experiment;" that Stanbon was not diligent at or immediately subsequent to the time Furber entered the field, and that therefore Furber was entitled to the award of priority.

The Commissioner ruled that: "The testimony clearly establishes that a machine embodying the invention in issue was built by Stanbon in March or April, 1903;" that this machine was a mere experiment, and not a reduction to practice; that Stanbon was not diligent the latter part of June or the first of July when Furber entered the field, and, because of this lack of diligence, Furber was entitled to the award of priority.

Stanbon, when he conceived this invention, was a manufacturer of light shoe machinery, and as a sort of adjunct to his machine shop he ran a small shoe factory under the name of Nicholson, Cole, & Company. This shoe factory was used as a trying out place for new machinery. It is not disputed that Stanbon completed and installed in this factory as early as April 4th, 1903, a machine embodying every element of this invention. Stanbon himself testifies that he operated this machine frequently while it was installed in his factory, and that its operation was entirely successful; that immediately thereafter he commenced to make "sketches" for a commercial machine, which was to be identical in every respect with the first machine except that it was to be a post instead of a bench machine; that as soon as he had completed the sketches for the

different parts of the new machine he gave them to his pattern maker for the purpose of having patterns made; that he devoted all the time he could to the making of these sketches; that it was particular work, since castings were to be made like the drawings. Mr. Stanbon also testified that the man he employed in his factory as cementer and beater out objected to the use of the cementing machine, because he contended he could do the work faster by hand. As he was paid by the piece his wages would have been affected. The witness knew of no reason why this man could not have used the machine, except that, owing to the small number of shoes he had to cement at one time, he could not get used to it so as to operate it properly. An unsuccessful effort was made by Stanbon to locate this former workman.

John Husler, Jr., foreman machinist for nine or ten years in this machine shop of Stanbon, testified that Stanbon began work on his first cementing machine in February, 1903; that after it was completed it was taken over to the shoe factory and tested; that the machine was complete in all respects as early as the middle of March; that he participated in its construction; that he saw Stanbon cement a number of pairs of shoes on it, and that he operated it himself and had no difficulty in doing so; that Stanbon informed him "that the machine was where he wanted it; then he talked of the general construction of the next machine;" that Stanbon "immediately started to sketch a full-sized machine for the pattern maker to work from." The witness saw Stanbon at work on the sketches for the commercial machine from day to day, and discussed the subject with him. Other machines were subsequently constructed like the first machine, and sold to the trade as early as January, 1904. After a rotary brush had been substituted by Stanbon for the oscillating brush, the witness, by Stanbon's direction, equipped two machines in Portland, Maine, with the new brush. These machines when sold by Stanbon were equipped with the oscillating brush, and one of the owners hesitated about permitting the change to be made, because he was satisfied with the operation of the machine without change.

Charles H. McIntire, in the laundry business when he testi-

fied, worked in Stanbon's shoe factory at the time the original cementing machine was completed. He stated that his work followed the work performed on this machine; that he left Stanbon's employ about the middle of April, 1903. The witness identified the reproduction of Stanbon's original machine, and testified that he had cemented twelve pairs of shoes on it at one time. Asked to state the circumstances under which he did this, the witness replied: "There was a hurried lot of twelve pair; the orders were given that they were to be gotten out that night. I had no other work ahead of me, and would be able to go home when I finished that twelve pair; but I had to wait until they were beat out, in order to do my work; so I cemented them and sized them out for the beater out;" that the witness afterwards nailed and slugged these shoes, and that the work done on the machine was properly done; that he has seen the beater out operate the machine successfully; that he had occasionally seen appellant operate the machine; that "he (appellant, would occasionally come in, do a lot of shoes, have them beat out, and send them along." The witness was asked whether, if the cementing by the aid of this machine had been improperly done, he would have discovered the fact in connection with his work, and answered: "I would, because each man is responsible for all work that passes him improperly done."

Richard A. Nicholson, the Nicholson of Nicholson, Cole, & Company, but who had severed his connection with appellant when he testified, remembered appellant's original machine, that it was used in the shop in cementing shoes, and that it properly performed the work.

Olaf P. Stanbon, a brother of appellant, who was employed in appellant's shoe shop in the spring of 1903, testified that he saw appellant successfully operate his original machine by cementing shoes thereon, and that Mr. Husler was present.

Furber introduced in rebuttal three former employees of Stanbon, two of whom had been discharged. The testimony of these witnesses is purely negative in character, and is not of sufficient importance to warrant analysis.

In constructing this original machine appellant made use of

a Cushing machine, which had been consigned to him for sale. This machine, however, embodied no features of this invention. After appellant had completed and tested his first machine, early in April of 1903, it was permitted to remain in his shoe factory for a period of about two months, when it was returned to the machine shop and taken apart. The Cushing machine was reassembled and subsequently returned to the owner. After the declaration of this interference, appellant purchased this identical Cushing machine, and again equipped it with the devices of the issue. Thus equipped the machine was introduced as an exhibit. It was not questioned in the argument at bar that this exhibit was an exact reproduction of the original machine. Neither was it questioned that the two machines sold to parties in Portland, Maine, were similarly equipped. The one defect that counsel for appellee could point out in this machine as originally constructed and operated was that cement would be liable to drip from the brush when the machine was not in operation. In other words, it is not denied, and indeed it could not well be, that the machine while in operation worked successfully and performed every function demanded of it. Because, however, there was a slight drip from the brush when the machine was not in operation, we are asked to say that the early trials did not constitute a reduction to practice.

In holding that appellant's original machine did not constitute a reduction to practice, we think the Commissioner erred. The testimony of the several witnesses who operated this machine is straightforward, consistent, and, to us, convincing. We can discover no reason why this testimony should be disregarded and a conclusion reached inconsistent therewith. This is not a case where it is impossible to reproduce an embodiment of the original structure. *Burson* v. *Vogel,* 29 App. D. C. 388. Neither is it a case where the operation of the device is so difficult and involved that witnesses testifying in reference thereto are liable to mistake. If the testimony of appellant's witnesses is to be accepted, his original device was, without question, a reduction to practice. If the statements of these witnesses in

any material respect were incorrect they could easily have been disproved by a further test of the machine, introduced as an exhibit. No importance appears to have been attached to the introduction of this exhibit by either the Examiners-in-Chief or the Commissioner. As the case stands the testimony of several intelligent and apparently truthful witnesses has been disregarded, notwithstanding that the machine about which they testified was an exhibit in the case, available to appellee.

Stanbon gave the names of those to whom he sold the early machines. Consequently it would have been a very easy matter for Furber to have disproved the statements of Stanbon's witness Husler to the effect that the machines sold to Portland, Maine parties operated successfully while equipped with the oscillating brush. The fact that the machine operated successfully when put to commercial use is certainly corroborative of the contention that the original tests were successful. Especially is this true where it is clear that no changes were made in the machine prior to such commercial use, and where the initial tests were made by those highly skilled in the art. We think too much importance was attached to Stanbon's failure to insist upon the use of this machine in his own factory. Under different circumstances such conduct on Stanbon's part would have been very significant, if not controlling. Considering, however, the small output of his factory, the fact that immediately after the trial of this machine he commenced to work on drawings for a commercial machine of the same design, that such a machine was constructed without any knowledge on his part that another had entered the field, we think the failure of his workman to use his machine becomes of little consequence. *Smith* v. *Brooks,* 24 App. D. C. 75. Moreover it does not appear that the commercial machine was used in the Stanbon factory. This is confirmatory of Stanbon's explanation as to why the early machine was not thus used.

It is not questioned that Stanbon conceived this invention, constructed a machine embodying every feature of it, and tested that machine several months prior to the earliest date claimed by Furber. We think these tests demonstrated to those

skilled in the art the success of the device, and hence that this early structure constituted a reduction to practice. *Wurts* v. *Harrington,* 10 App. D. C. 149; *Roe* v. *Hanson,* 19 App. D. C. 559; *Burson* v. *Vogel,* supra. This finding renders it unnecessary to determine the question of Stanbon's diligence at and subsequent to Furber's entry into the field. We find nothing, however, in the testimony bearing on this point that in any way militates against the finding that Stanbon's early construction constituted a reduction to practice. On the contrary, we think that Stanbon's conduct following the construction of his first machine was consistent with that finding. Whether the commercial machines were completed in December of 1903, or earlier, we do not deem material in view of the fact that there was nothing in Stanbon's conduct at any time to indicate any disposition to delay unduly the development and exploitation of his invention.

The decision is reversed, and the clerk will certify these proceedings as by law required.                          *Reversed.*